972 F.2d 1340
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Marvin A. MCNATT, Plaintiff-Appellant,
v.
ALLIED-SIGNAL, INC., Richard A. Graser, and James E.
Greenslade, Defendant-Appellee.
 No. 91-55742.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 8, 1992.
Decided Aug. 11, 1992.
 
 1
 Before SNEED, D.W. NELSON, Circuit Judges, and ROLL*, District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 This is an action for wrongful termination brought originally in a California state court and removed to federal court, in which Marvin McNatt, the plaintiff and a California resident, appeals pro se the district court's finding that diversity jurisdiction existed.[1] McNatt also appeals the district court's subsequent grant of summary judgment in favor of his former employer, Allied-Signal, Inc., and two of his supervisors, Richard Graser and James Greenslade. We find that the district court was premature in its determination that diversity jurisdiction existed, and, therefore, reverse and remand. We should not and do not reach the summary judgment issues.
 
 I. FACTS AND PROCEEDINGS BELOW
 
 4
 McNatt originally filed in California state court on August 1, 1989. The complaint alleged 17 causes of action, all dealing in one form or another with McNatt's termination of employment as an aircraft "sales engineer" with Allied-Signal, on August 5, 1988. Included in the complaint were allegations that Allied-Signal breached both a written and an implied-in-fact employment contract, that Allied-Signal fired McNatt without good cause, and that Allied-Signal owed McNatt about $30,000 in unpaid commissions. McNatt also alleged claims sounding in tort for, among other things, fraud, defamation, infliction of emotional distress, and general negligence.
 
 
 5
 The gravamen of the case was that McNatt's supervisors, Greenslade and Graser, severely miscalculated projected sales on an expensive engine retrofit program for the Falcon F20 aircraft, and instead of taking responsibility for an expected shortfall of at least $45 million in sales revenues, decided to blame McNatt's sales performance and terminate his employment. In McNatt's words, he was their "scapegoat" and "sacrificial lamb." McNatt also alleged that his firing could be attributed, at least in part, to wrongful retaliation for business and commission disputes with both Graser and Greenslade, and for McNatt's questioning in 1988 of the legality of certain provisions in a new health insurance contract purchased by Allied-Signal on behalf of its employees.
 
 
 6
 On May 22, 1990, Allied-Signal filed a notice of removal to federal court based on diversity of citizenship. The court set a priority briefing schedule on the diversity question, and Allied-Signal then filed a memorandum in support of removal jurisdiction on June 11, 1990. In their memorandum, Allied-Signal asserted that they were a Delaware corporation whose principal place of business was New Jersey, and that both Greenslade and Graser were Arizona citizens. Complete diversity for purposes of 28 U.S.C. § 1332 appeared to exist.
 
 
 7
 McNatt saw it differently. He filed an opposition to the notice of removal on June 21, 1990, in which he denied complete diversity existed. McNatt admitted that Greenslade and Allied-Signal were both diverse as to McNatt, but he asserted that Graser was a California citizen. Removal was therefore improper. McNatt alleged that Graser owned both a home and a yacht in California, spent about four days a week in California, and took a homeowner's tax exemption for his California property. According to McNatt, when "Graser is present in Arizona he is there because defendant Allied Signal, Inc. requires him to be there for work."
 
 
 8
 Allied-Signal filed a reply to McNatt's opposition on July 6, 1990, which was accompanied by a sworn affidavit of Graser. In the affidavit, Graser stated that he had moved to Arizona in April 1989, and that he intended at that time for Arizona to be his "permanent residence and place of work indefinitely." Graser noted that he purchased a home in Arizona some months after his arrival, that he attends and contributes to a local church, that he pays Arizona income tax, and that he spends only between four and six days a month in California. Graser also sought to distance himself from all his California ties. For instance, although he admitted that he continued to own his old home in Palos Verdes, he asserted that it was primarily for long-term investment purposes. He also noted that, after his move to Arizona, he changed his status at the yacht club in California to "non-resident member," and took on a partner in the boat.
 
 
 9
 On September 20, based solely on the "pleadings and other documents filed," the district court found that the required diversity existed and that jurisdiction was proper. McNatt, however, would not drop the issue. Almost three months later, December 6, 1990, he served Graser with an initial set of interrogatories and a request for production. Their purpose was to elicit information that would either impeach or contradict Graser's earlier affidavit. For instance, McNatt requested access to Graser's tax returns, tax-related documents, and his credit card statements, and he sought information pertaining to the whereabouts of Graser's valuable personalty. McNatt also inquired into the following: Graser's listed address on his Form 1040, whether Graser had taken a homeowner's exemption for his California property, what state issued Graser's current driver's licence, the location of assets and bank accounts, whether Graser had received travel allowances or relocation assistance from Allied-Signal, whether Graser was registered to vote in Arizona, and whether Graser had made charitable contributions to churches in California. Graser responded that the interrogatories and production requests were either irrelevant, requested privileged information, or violated Graser's rights to privacy. No substantive responses were given, nor were any documents produced.
 
 
 10
 On February 1, 1991, McNatt met with defense counsel in order to discuss settlement and work out disagreements regarding whether McNatt's discovery requests dealt with relevant or otherwise discoverable information. The meeting was apparently not helpful, and three days later McNatt moved the court to compel discovery. Allied-Signal and Graser objected to the motion to compel. They insisted that McNatt had failed to comply with a local rule of procedure, C.D.Cal.R. 7.15.1,[2] by refusing to make a good faith effort to resolve the outstanding discovery disputes with defense counsel at their February 1 meeting. They also asserted that McNatt had not given Allied-Signal and Graser an opportunity to prepare specific authority in support of their opposition to the discovery requests, as required by C.D.Cal.R. 7.15.2 and 7.15.4.[3]
 
 
 11
 Although McNatt had noticed the motion to compel for a hearing, the magistrate, by written order, denied oral argument. On March 11, 1991, the magistrate found, based on "[t]he unrefuted declaration" of defense counsel, that McNatt had violated Local Rule 7.15. The magistrate denied McNatt's motion to compel without prejudice. Apparently, McNatt made no further effort to compel discovery, perhaps because the preset discovery cutoff had expired on January 15, 1991.
 
 
 12
 The case then proceeded to the summary judgment stage on McNatt's substantive allegations. The district court granted summary judgment against each of McNatt's 17 allegations. This appeal followed.[4]
 
 II. DISCUSSION
 
 13
 As a predicate matter to reaching McNatt's substantive appeal, we must first independently determine whether the district court properly exercised diversity jurisdiction. This is a mixed question of law and fact, which we review de novo. Lew v. Moss, 797 F.2d 747, 750 (9th Cir.1986). The district court's findings of fact, however, are reviewed for clear error, and Fed.R.Civ.P. 52(a) applies. Id.; see Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 13B Federal Practice and Procedure § 3612 at 541 (2d ed. 1984) [hereinafter 13B Federal Practice].
 
 
 14
 In order to establish diversity jurisdiction under 28 U.S.C. § 1332(a)(1), the action must be between "citizens of different States." Over the years, courts have developed a straightforward test to determine state citizenship. For a natural person to be a citizen of a particular state, he must be both a United States citizen and be "domiciled" in a state of the United states. Lew, 797 F.2d at 749. The concept of "domicile," in turn, is also judicially defined. In order to be domiciled in a state, a natural person must (1) establish a fixed habitation or abode, and (2) intend to remain there permanently or indefinitely. Id. at 749-50.
 
 
 15
 Domicile is determined at the time the initial action is filed. Id. at 750. Jurisdiction itself may be challenged at any time, either upon motion or by the court itself. Fed.R.Civ.P. 12(h)(3). Because federal courts are courts of limited jurisdiction, there is a presumption against exercising diversity jurisdiction. See Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, 13 Federal Practice and Procedure § 3522 (2d ed. 1984). Accordingly, the ultimate burden in establishing diversity is on the party seeking to invoke it. Lew, 797 F.2d at 751. Moreover, there is a presumption in favor of an established domicile as against a newly acquired one. Id. The standard of proof to be employed by the trier of fact is the preponderance of the evidence. See 13B Federal Practice § 3611 at 521 & n. 34.
 
 
 16
 A correct synthesis of these principles requires that the record show the following: That Graser came forward with sufficient evidence to overcome the presumption against his newly acquired domicile, and that he established by a preponderance of the evidence an Arizona residence with the intention of remaining there indefinitely. The record does not support such a finding.
 
 
 17
 The only evidence received by the district court on Graser's citizenship was his affidavit. In it, Graser recited that as of April 1989, he moved to Arizona with the requisite intent to remain indefinitely. Although probative, this statement should be treated with some skepticism when federal jurisdiction is at issue. See 13B Federal Practice § 3612 at 532 ("A party's own declarations concerning his domicile, as is true of any self-serving statement, are subject to judicial skepticism. They are accorded little weight when in conflict with the facts."). Graser also offered four affirmative facts supporting Arizona citizenship: That he had purchased a new home in Arizona, that his work was based in Arizona, that he received his paycheck in Arizona and paid Arizona state income tax, and that he slept an average of four nights a week at his Arizona home.
 
 
 18
 We first address Graser's declaration regarding the purchase of his Arizona home. Graser states that, upon his April move, he rented an apartment in Scottsdale. Only "[a]fter several months," however, did Graser contract to purchase his home. Graser does not say whether the contract occurred before or after the filing date of August 1, the crucial date for establishing an intent to indefinitely reside in Arizona. More information about the date of the purchase is needed.
 
 
 19
 Graser's explanation of his reason for his move to Arizona is also weak. He stated: "[My boss] essentially told me that if I wanted to remain with the ... team, I had better get myself to Arizona." However, moving for a limited purpose such as to pursue employment is often not alone sufficient to destroy an affiliation with the prior domicile. See 13B Federal Practice § 3613 at 547 & n. 10 (collecting cases).
 
 
 20
 Finally, dubiety springs from the face of Graser's affidavit when he explains the domicile of his wife. He stated: "I continue to own jointly with my wife residential property in Palos Verdes, California where my wife resides when she is not with me in Arizona or elsewhere." (emphasis supplied) This statement leaves open the possibility that Graser's wife continues to maintain her residency in California. Should that be true, another well-established judicial presumption is implicated: For citizenship purposes, married people are presumed to be domiciled with their spouse and family. See Lew, 797 F.2d at 750; 13B Federal Practice § 3612 at 534 & n. 25. Graser's declaration, having invoked this presumption, did nothing to rebut it.
 
 
 21
 For these reasons we hold that the record does not establish that diversity jurisdiction existed at the time McNatt filed his suit in California state court. We therefore remand with instructions that the district court take additional evidence on the question of diversity. See, e.g., Bank One, Texas, N.A. v. Montle, 964 F.2d 48 (1st Cir.1992); Prakash v. American Univ., 727 F.2d 1174 (D.C.Cir.1984); Shahmoon Indus. v. Imperato, 338 F.2d 449 (3d Cir.1964); Seideman v. Hamilton, 275 F.2d 224 (3d Cir.), cert. denied, 363 U.S. 820 (1960).
 
 
 22
 We do not attempt to dictate what actions the district court should take on remand. We note, however, in a situation where jurisdiction is challenged, "the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." Williamson v. Tucker, 645 F.2d 404, 414 (5th Cir.), cert. denied, 454 U.S. 897 (1981). McNatt's served interrogatories are a good starting point. Those inquiries were certainly relevant, see Lew, 797 F.2d at 750, and likely did not cover, so far as the tax information is concerned, privileged material, see Heathman v. United States Dist. Court, 503 F.2d 1032, 1034 (9th Cir.1974). Graser's responses essentially disregarded the inquiries.
 
 
 23
 We need not rule expressly on the question whether McNatt's violations of the local discovery rules constituted sufficient grounds for the magistrate to deny McNatt's request to conduct additional discovery on the diversity question. The record as it stands alone is not enough to establish diversity jurisdiction. On remand, we are confident the court will afford McNatt an adequate opportunity to develop facts relating to discovery as is appropriate to the case at hand.
 
 
 24
 Because diversity may well prove lacking, we properly decline to express any opinion on the granting of summary judgment.
 
 
 25
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 *
 Honorable John M. Roll, United States District Judge for the District of Arizona, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 We should note that McNatt is a licensed California attorney. He relates that he has not practiced law since becoming an aircraft salesman in November of 1976
 
 
 [2]
 This rule requires counsel to "meet in person in a good faith effort to eliminate ... as many disputes as possible," before filing any discovery related motions such as McNatt' motion to compel. C.D.Cal.R. 7.15.1
 
 
 [3]
 C.D.Cal.R. 7.15.2 requires each counsel to formulate written stipulations, including a written statement of legal authority, on any discovery issue that cannot be worked out informally. C.D.Cal.R. 7.15.4 requires the party seeking discovery to give the opposing party seven days, after the Rule 7.15.1 meeting, to prepare the Rule 7.15.2 stipulation. In this case, McNatt waited only three days before serving the motion to compel
 
 
 [4]
 There is a minor issue raised by McNatt regarding the propriety of some $2000 in costs assessed against him by the court clerk pursuant to Fed.R.Civ.P. 54(d). Because the appellees are no longer prevailing parties within the meaning of that rule, the issue is now moot